FILED

2015 Jan-30  PM 12:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **BILLY HOLLINGSWORTH,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **4:13-CV-01623-KOB** |
| **O'REILLY AUTOMOTIVE STORES,** ] | |
| **INC.,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |

## MEMORANDUM OPINION

This case is before the court on Defendant O'Reilly Automotive Stores, Inc.'s motion for summary judgment. (Doc. 21). Petitioner Billy Hollingsworth brings three separate claims in this suit. (Doc. 1). First, Hollingsworth claims that O'Reilly discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). Second, Hollingsworth claims that O'Reilly discriminated against him on the basis of his disability and denied him reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"). Finally, Hollingsworth claims that O'Reilly subjected him to a hostile work environment in violation of the ADA and ADEA.

For the reasons discussed below, the court will GRANT O'Reilly's motion for summary judgment as to the ADEA and ADA disparate treatment claims, and the ADEA and ADA hostile work environment claim. The court will DENY O'Reilly's motion for summary judgment as to the ADA failure to accommodate claim.

1

## I.      STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "Even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-

serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## II.     STATEMENT OF FACTS

Hollingsworth is a fifty-six year old man.  As a teenager, he was involved in a motorcycle accident that left him with a curved spine, an immobile right hip joint, and one leg that is several inches shorter than the other.  As a result of his injuries, Hollingsworth now walks with a noticeable limp.

In July of 2007, O'Reilly hired Hollingsworth to work as a "Parts Specialist" at O'Reilly's Store 1312 in Arab, Alabama.  In the Fall of 2008, Hollingsworth transferred to a Delivery Specialist position, which required that he be able to lift and carry items weighing up to sixty pounds without assistance and perform "team lifts" of items weighing sixty-one pounds or greater.  Although the delivery specialist job description provided that items weighing greater than sixty pounds would be moved using "team lifts," Hollingsworth was frequently required to lift and carry items weighing in excess of sixty pounds without assistance.  Additionally, even when he requested assistance, other employees would refuse to help.

During his time as a delivery specialist, Hollingsworth informed the manager of store 1312, Donnie Reliford,[1] that lifting the heavy items was hurting his back and hip.  He also complained that the other delivery specialist, James Casey, was allowed to play on his phone instead of making deliveries.  Hollingsworth explained to Reliford that he was lifting a disproportionate number of

---

[1] Reliford was the store manager from the time Hollingsworth was hired until April 27, 2008, when Reliford stepped-down to a position as an Installer Service Specialist ("ISS"). Although Reliford did not have any supervisory authority over any employees as an ISS, he directed the Delivery Specialist routes.  On June 5, 2011, Reliford resumed his position as store manager.

heavy items because Casey was not performing his work obligations and asked Reliford to have Casey or one of the other employees assist him in lifting heavier items.  In response, Reliford told Hollingsworth that if he could not perform the work, then Reliford would find someone who could. In addition to complaining to Reliford, Hollingsworth called the O'Reilly HR department on two separate occasions to complain about Casey and the uneven distribution of work.  Hollingsworth did not speak to an HR representative either time but left a voice message.

Reliford failed to take any steps to insure that Hollingsworth received assistance lifting heavy items, and  Hollingsworth never received a return call from anyone in the HR department.

**Evidence supporting Hollingsworth's hostile work environment claim**

During his employment, Hollingsworth was occasionally called "gimpy" or "crip" by some of the other employees, including two assistant managers.  Hollingsworth also testified that on five to ten occasions Reliford called him "old man" and told him "I don't know why don't just you [sic] go home and draw a check, you know, instead of coming over here."  (Doc. 23-1, p. 51–52).

**Hollingsworth's termination**

On July 20, 2012, O'Reilly terminated Hollingsworth for violating O'Reilly's cell phone policy, which provides that "[c]ell phones. . . are not permitted in the passenger compartment of delivery vehicles." (Doc. 29).  A driver does not need to use the phone to violate the policy; simply having the phone in the passenger compartment is a violation.  Although O'Reilly has no written discipline policy, Human Resources Manager Farlon Williams testified that the first time an employee violates the cell phone policy he is issued a "first and final warning."  An employee who violates the policy a second time is terminated.

In January of 2012, an O'Reilly employee saw Hollingsworth talking on his cell phone while

driving a company vehicle.   Based on this report, District Manager Bo Waldrop issued Hollingsworth his first and final warning.   (Doc. 23-1).   In June  of 2012, Waldrop saw Hollingsworth driving with a cell phone and informed Human Resource Manager Williams. Williams told Waldrop that he would not terminate Hollingsworth at that time because Waldrop had not confronted Hollingsworth about the violation.

On July 17, 2012, Daniel Pierce, a  store manager of a nearby O'Reilly's store, spent the day helping Reliford catch up on paperwork at Store 1312 in Arab.  On his way home from Arab, Pierce saw Hollingsworth with his hand up to his ear while driving a company vehicle. Pierce called Reliford and informed Reliford that he had seen Hollingsworth talking on his cell phone.   Reliford told Pierce that he should inform District Manager Waldrop of what he had seen.  (Doc. 23-2).  The next morning, July 18, 2012, Pierce spoke with Waldrop, who told Pierce to send him an e-mail regarding what Peirce had witnessed.  (Doc. 23-10; Doc. 23-6).  Pierce sent the following e-mail to Waldrop on July 18, 2012:

> Yesterday I was working at store 1312 Arab.  When I left the Arab store headed North on Hwy. 231 I looked over seen [sic] Billy in a delivery truck driving beside me. [sic]  in front of Tractor Supply.  I threw up my hand to wave at him and I noticed he did not wave back I looked again and saw that he had his cell phone to his ear and was talking on the phone.  When Billy was confronted about it when he got back to the store, he denied it.  He stated that he wasn't on the phone and didn't know what I was talking about.  He was given notice that Bo Waldrop, the DM, would be notified.

(Doc. 23-2, p. 162).

Upon receiving the e-mail, Waldrop forwarded Pierce's statement to Human Resources Manager Williams.  Waldrop also sent Williams a statement made by Reliford that he and two employees saw a phone charger plugged into Hollingsworth's company vehicle. (Doc. 23-2).  After

reviewing the evidence, Williams consulted the corporate Team Member Relations Department and then approved Hollingsworth's termination.  (Doc. 23-5).

On July 20, 2012, Reliford and Waldrop met Hollingsworth in the parking lot behind the O'Reilly's store and informed Hollingsworth that he was being terminated for violating O'Reilly's cell phone policy.  That same day, Hollingsworth's wife, Kim Hollingsworth,  had driven to the O'Reilly store to meet Hollingsworth for lunch, and she recorded part of the termination proceeding on her Ipad.  In the video, another delivery driver, Mike Casey, can be seen walking from his delivery vehicle with an object that appears to be a cell phone clipped to his shorts pocket.  Casey appears in the video a second time, walking back to his delivery vehicle and driving away.  Neither Reliford nor Waldrop give any indication that they saw Casey carrying the cell phone, and Waldrop later declared that he did not see the phone on Casey's hip.[2]  (Doc. 30, Doc. 23-3).

On September 18, 2012, Williams visited the store managed by Pierce.  During the visit, Pierce informed Williams that he had not actually seen Hollingsworth speaking on the phone but had only seen Hollingsworth with his hand up to his head like he was talking on a cell phone.  (Doc. 23-5).  On January 7, 2013, Williams approved the issuance of a first and final warning against Pierce for falsely stating that he saw Hollingsworth on the cell phone while driving a company vehicle. (Doc. 29-6, p. 2).

Additional statements Pierce made in his e-mail to Waldrop were also inaccurate.  First, although Pierce claimed that Hollingsworth was "confronted" on July 17, 2012, the record contains no evidence any O'Reilly employee ever confronted him.  (Doc. 23-6; Doc. 23-2).  Pierce explained in his deposition that he had told Waldrop that Hollingsworth had been confronted because that is

---

[2] Reliford was never asked whether he saw a cell phone on Casey's hip.

what another employee had told him.  However, Pierce could not remember from whom he had heard this information.  Pierce also falsely stated in his e-mail that "[Hollingsworth] was given notice that Bo Waldrop, the DM, would be notified."  Pierce admitted that he never spoke with Hollingsworth after seeing him driving the company vehicle on July 17, 2012.  His explanation for this inaccuracy was that what he had meant to say was that he had notified Waldrop.

On November 20, 2012, Hollingsworth filed an EEOC charge against O'Reilly.[3]

In August of 2012, Hollingsworth applied for Social Security Disability Insurance.  In his application, Hollingsworth states that he stopped working on July 20, 2012, "because of [his] disabling condition."  (Def. Ex. A. at Ex. 7).

## III.    DISCUSSION

### A. Hollingsworth's Age Discrimination Claim Under the ADEA

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual . . . because of such individual's age."  *Chapman v. Al Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing 29 U.S.C. § 623(a)(1)).  A plaintiff may establish a claim of illegal age discrimination through either direct or circumstantial evidence.  *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008).  A plaintiff relying on circumstantial evidence must prove discrimination under the ADEA using the *McDonnell Douglas* burden-shifting framework.  *Chapman*, 229 F.3d at 1024.  Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of age discrimination by showing that he: (1) is a member of the protected class; (2) was

---

[3] Neither party submitted any documentation relating to the EEOC charge.  However, because O'Reilly does not argue that Hollingsworth failed to exhaust his administrative remedies, this court assumes for the purposes of this motion that he did.

7

qualified for his position; (3) was subjected to adverse employment action; and (4) suffered from disparate treatment because of membership in the protected class. *See Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).

Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate non-discriminatory reason for its action. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993). This burden is "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994). Once the employer offers a legitimate non-discriminatory reason, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason for its actions is pretextual and that the employer in fact intended to discriminate. *Id.*

The parties do not dispute the first three elements of the *prima facie* case.[4] Therefore, the only remaining question is whether Hollingsworth satisfies the fourth prong—that he suffered disparate treatment because of his age. A plaintiff may establish the fourth element by showing that a younger individual who engaged in similar misconduct was treated differently or that the plaintiff was replaced by a younger employee. *See Caraway v. Sec'y U.S. Dep't of Transp.*, 550 F. App'x 704, 709 (11th Cir. 2013) (per curiam); *Corbin v. Southland Int'l Trucks*, 25 F.3d 1545, 1549 (11th Cir. 1994). The law has not laid a bright-line rule for how much younger a comparator must be to show disparate treatment. *Corbin*, 25 F.3d at 1549. However, the Eleventh Circuit has instructed that the comparator must be "substantially younger" such that "the discrepancy between the ages,

---

[4] O'Reilly concedes that Hollingsworth is a qualified individual for the purpose of Hollingsworth's ADEA claim but contends that Hollingsworth is not a qualified individual for the purpose of Hollingsworth's failure to accommodate ADA claim.

along with any other relevant evidence, is sufficient that a fact finder could reasonably infer age discrimination." *Id.*; *see Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996).

In the present case, Hollingsworth fails to offer a "substantially younger" comparator that would allow a jury to infer that O'Reilly terminated Hollingsworth because of his age. Hollingsworth, who was fifty-six at the time of his termination, points to two comparators from which he argues a jury could infer age discrimination—Mike Casey, a fifty-five year old, and Charles Carson, Jr, a fifty-three year old. The one and three year respective age differences between Hollingsworth and his two comparators, without more, is insufficient evidence to allow a jury to infer that Hollingsworth was terminated because of his age. *See Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1390 (11th Cir. 1983) (concluding that a two-year difference in age, without additional evidence of discrimination, was insufficient to show age discrimination); *Steel v. U.S. Dept. of Veteran Affairs*, No. 8:10-cv-732, 2011 WL 2160343, at *10 (M.D. Fla. June 1, 2011) ("[A] 13-year age difference, without more, is insufficient to [show age discrimination]."); *O'Connor*, 517 U.S. 308, 312–13 (1996) ("[An inference of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger."). As such, Hollingsworth cannot establish a *prima facie* case of age discrimination under the ADEA, and O'Reilly's motion for summary judgment on this claim is due to be granted.

## B. Hollingsworth's Disability Discrimination Claim Under the ADA

### 1. Hollingsworth's ADA Disparate Treatment Claim

The *McDonnell Douglas* framework discussed above also applies to Hollingsworth's ADA disparate treatment claim. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003) (reviewing ADA disparate treatment claim under *McDonnell Douglas* framework). To establish a *prima facie* case

of disability discrimination, Hollingsworth must show that "(1) he was disabled; (2) he was qualified to perform the job, and (3) he was subjected to an adverse employment action because of his disability." *Ward v. U.P.S.*, 580 F. App'x 735, 740 (11th Cir. 2014). O'Reilly concedes that Hollingsworth meets the first prong of the *prima facie* case but argues that Hollingsworth fails to meet the second and third prongs.

O'Reilly contends that Hollingsworth is estopped from claiming that he meets the second element—that he was qualified to perform his job—based on his application for Social Security Disability Insurance ("SSDI"), in which he averred that he was unable to do his past relevant work because of his disability. To qualify for SSDI, an applicant must be disabled—i.e. "unable to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment." 42 U.S.C. § 423(d)(1)(A). This requirement seems at odds with the second prong of the *prima facie* case for ADA discrimination, which requires that a plaintiff be able to "perform the essential functions of [his] employment position." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807–08 (1999) (quoting 42 U.S.C. § 12111(8)). Although the requirements of the ADA and SSDI are in tension, "pursuit, and receipt, of SSDI does not automatically estop the recipient from pursuing an ADA claim." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802–03 (1999). Instead, an ADA plaintiff must explain why his SSDI application is consistent with his ADA claim. *Id.*

In the present case, Hollingsworth explains that his SSDI application is consistent with his ADA claim because, unlike the Social Security Administration, the ADA considers the possibility of reasonable accommodations when determining whether an individual is disabled. *See* 42 U.S.C. § 12111(8) ("'qualified individual' means an individual who, *with or without reasonable accommodation*, can perform the essential functions of the employment position"). Hollingsworth

argues that because he can only perform his employment duties with a reasonable accommodation—assistance from other employees when lifting heavy items—he can qualify as disabled for the purposes of SSDI while still satisfying the ADA requirement that he be able to perform the essential functions of his employment position.  Therefore, because Hollingsworth can reasonably explain the seeming inconsistency between his SSDI application and his ADA claim, he is not estopped from claiming that he is a "qualified individual."  *See Cleveland*, 526 U.S. at 803 (recognizing that an individual may be disabled for the purposes of SSDI but not under the ADA because the SSDI does *not* consider the possibility of reasonable accommodations when determining whether an individual is able to perform work); *Talavera v. Sch. Bd. of Palm Beach Cnty.*, 129 C.3d 1214, 1220 (11th Cir. 1997).

Having determined that Hollingsworth satisfies the first two elements of his *prima facie* case, the question becomes whether Hollingsworth meets the third element—that he was subjected to unlawful discrimination as the result of his disability.  A plaintiff typically meets this burden by showing that an employee who engaged in similar misconduct was treated more favorably.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). The theory behind this comparator analysis is that a fact finder could infer discriminatory animus from a decision-maker's preferential treatment of non-disabled employees over disabled employees who engaged in similar misconduct.  Of course, an underlying assumption of the comparator analysis is that the decision-maker is actually aware of the non-disabled employee's misconduct—the crux of the issue here.

Hollingsworth attempts to satisfy this element by pointing to Mike Casey, a non-disabled employee who violated the cell phone policy but who was not disciplined.  However, unlike Hollingsworth, no supervisor ever observed Casey violating the cell phone policy, nor did any

employee report Casey's cell phone policy violations to any decision maker.  Hollingsworth attempts to overcome this deficiency by pointing to the Ipad video recording made of his termination.  In the video, Casey can be seen in the background walking towards his company vehicle with a large cell phone clipped to his pants.  Waldrop, who terminated Hollingsworth for violating the cell phone policy, was present at the time the video recording was made but testified that he never saw Casey with the cell phone.  Hollingsworth attempts to overcome Waldrop's testimony with two arguments.

First, Hollingsworth contends that Waldrop, "was in a position to see the cell phone on Mike Casey's belt."  (Doc. 29-5, p. 4).  However, in light of Waldrop's uncontradicted testimony to the contrary, Hollingsworth's contention that Waldrop *could* have seen Casey with the cell phone is insufficient to create a genuine issue of material fact as to whether Waldrop did in fact see the cell phone.  *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (a plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment"); *Giddens v. Calhoun State Prison*, 277 F. App'x 847, 847 (11th Cir. 2007) (per curiam) ("Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.").

Second, Hollingsworth asserts that if Waldrop did not see Casey violating the cell phone policy, it was only because Waldrop was "willfully blind."  The willful blindness doctrine, which most often is used in criminal law, provides that "knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposely contrives to avoid learning of it."  *Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir. 2002).  Although the Supreme Court has applied the willful blindness doctrine to some civil claims, neither the Supreme Court nor the Eleventh Circuit have ever held that the willful blindness doctrine applies to discrimination claims.  *See Global-Tech*

*Appliances, Inc. v. SEB S.A.*,–U.S.–, 131 S.Ct. 2060, 2070–71 (2011) (holding that the willful blindness doctrine is applicable to civil lawsuits for induced patent infringement).  Nevertheless, assuming *arguendo* that the willful blindness doctrine applies to such claims, Hollingsworth fails to show that Waldrop was willfully blind to Casey's violation of the cell phone policy.

The doctrine of willful blindness requires "(1) that the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc.*, 131 S. Ct. at 2070.  In the present case, Hollingsworth fails to point to any evidence that Waldrop subjectively believed that Casey was carrying a cell phone.  Instead, Hollingsworth relies on the video recording which shows Waldrop standing with his back to Casey.  Hollingsworth argues that Waldrop must have chosen to keep his back to Casey because he knew Casey was violating the policy.  However, the fact that Waldrop had his back to Casey is only evidence that Waldrop had his back to Casey.  The video does not offer any glimpse into Waldrop's subjective beliefs, and Hollingsworth fails to explain how Waldrop could have known Casey was carrying a cell phone into a company vehicle.  Hollingsworth's conjectures, absent any evidence showing Waldrop knew or even believed Casey to be carrying a cell phone,  are insufficient to create a genuine issue of material fact as to whether Waldrop was "willfully blind." *See Holified*, 115 F.3d at 1564 n.6; *Giddens*, 277 F. App'x at 847.  Because Hollingsworth fails to present evidence from which it could be reasonably inferred that any decision-maker was aware that Casey violated the cell phone policy, Casey is not a suitable comparator.

Hollingsworth next argues that even if Casey is not a suitable comparator, he can still satisfy the *prima facie* case because he was replaced by a non-disabled individual, Charles Carson, Jr. Assuming that Carson is an appropriate comparator,  O'Reilly's motion for summary judgment on

13

this claim is still due to be granted because Hollingsworth cannot demonstrate that O'Reilly's proffered reason for terminating Hollingsworth was pretextual.

Once a plaintiff meets his burden of establishing a *prima facie* case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for terminating the plaintiff.  *See Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) ("The employer's burden of production is exceedingly light.") (internal quotation omitted).  O'Reilly presents evidence that Waldrop and Williams terminated Hollingsworth because they believed he had violated the cell phone policy on July 17, 2002, after having already received a "First and Final Warning."  Although a dispute arose as to whether Hollingsworth actually had a cell phone in his car on the day in question, no evidence suggests that Williams, the decision maker, did not believe that Hollingsworth had violated the cell phone policy.  *See Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such a belief," the discharge does not violate federal law.); *Usry v. Liberty Reg'l Med. Ctr., Inc.*, 560 F. App'x 883, 889 (11th Cir. 2014).

Because O'Reilly meets the minimal burden of articulating a legitimate, non-discriminatory reason for terminating Hollingsworth, the burden shifts back to Hollingsworth to show that O'Reilly's reason was pretextual. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).  To establish pretext, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision."  *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks and citations omitted).  In evaluating pretext at the summary judgment stage, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

14

in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citations omitted).

Hollingsworth attempts to meet this burden in two ways. First, Hollingsworth argues that Waldrop's failure to confront Casey for violating the cell phone policy is evidence of pretext. However, as previously discussed, Hollingsworth fails to present evidence that Waldrop saw Casey carrying his cell phone into a company vehicle. Therefore, Waldrop's failure to confront Casey is not evidence of pretext but only evidence that Waldrop was unaware of Casey's violation.

Second, Hollingsworth argues that he has presented evidence from which a jury could infer that Waldrop and Reliford put Pierce up to submitting a false report to get Hollingsworth fired. He contends that under the cat's-paw theory, Reliford and Waldrop's alleged plan to get Hollingsworth fired creates a material dispute as to whether he was terminated because of his disability. In support of his argument, Hollingsworth cites the Eleventh Circuit's unpublished opinion in *King v. Volunteers of Am., N. Ala., Inc.*, 502 F. App'x 823 (11th Cir. 2012) ("[I]f a supervisor performs an act motivated by animus . . . that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."). However, the facts of the present case are distinguishable from those of *King*.

In *King,* the Eleventh Circuit held that a material dispute arose whether the plaintiff, a black female, had been terminated based upon the employer's proffered reason—that she had been repeatedly reprimanded for violating company policy—or whether she was terminated because of her race. *Id*. at 829. In reaching this conclusion, the Court pointed out that the plaintiff's supervisor made "outrageous, daily statements derogating African–American employees" and threatened to get

the plaintiff fired for filing complaints against her. *Id.* at 828–29. The plaintiff also presented evidence that all of the reprimands had been signed by her supervisor and that "several of the reprimands . . . occurred only because of some act by [her supervisor]." *Id.* at 828. Finally, the plaintiff presented evidence that her supervisor forced another employee to write a statement falsely attesting that the plaintiff had violated company policies. *Id.* at 825.

In contrast to *King*, in which substantial evidence showed the supervisor had orchestrated the plaintiff's termination, the record in the present case is almost completely devoid of evidence from which a jury could infer that Waldrop and Reliford conspired to cause Hollingsworth's termination. Hollingsworth cites the following evidence in support of his cat's-paw argument: (1) Reliford and Pierce were friends and were together on the day that Pierce claimed to have seen Hollingsworth using his cell phone; (2) Pierce's written statement, which was the basis on which Williams decided to terminate Hollingsworth, incorrectly stated that Hollingsworth had been "confronted" about violating the cell phone policy; (3) Waldrop had previously reported to Williams that he had observed Hollingsworth violating the cell phone policy, but Williams had declined to terminate Hollingsworth because Hollingsworth had not been confronted; and (4) Reliford had previously imitated Hollingsworth's limp and told him that if he could not perform his job without assistance, then Reliford would find someone who could. Hollingsworth argues that based on this evidence, a reasonable jury could conclude that Pierce or Waldrop, knowing that Williams would not terminate Hollingsworth otherwise, must have told Pierce to falsely report that Hollingsworth violated the cell phone policy and had been confronted about the violation. However, even crediting all of this evidence, the record is insufficient to support a jury's finding that Reliford, Pierce, and Waldrop entered into a plot to cause Hollingsworth's termination.

16

Unlike *King*, in which the plaintiff presented substantial evidence that she was the victim of her supervisor's racial discrimination, Hollingsworth offers only isolated facts tied together with speculation.  The leaps that a fact finder would have to make to find pretext in the present case are too great, and Hollingsworth's narrative does not rise above conjecture.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").  Accordingly, O'Reilly's motion for summary judgment on this claim is due to be granted.

### 2. Hollingsworth's ADA Failure to Accommodate Claim

Unlike Hollingsworth's ADA disparate treatment claim, the the *McDonnell Douglas* framework does not govern his failure to accommodate claim.  *See Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, *9 (11th Cir. Aug. 24, 2007) ("[W]e . . . hold that *McDonnell Douglas* burden-shifting is not applicable to reasonable accommodation cases.").  Instead, Hollingsworth can establish a failure to accommodate claim by simply proving a *prima facie* case of disability discrimination.  *See id.*  Once Hollingsworth meets this burden, summary judgment is inappropriate. *See id.*  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: "(1) he is disabled; (2) he was a 'qualified individual' at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).

In the present case, O'Reilly concedes that Hollingsworth satisfies the first two elements of the *prima facie* case but presents two arguments for why Hollingsworth has not met the third.  First,

O'Reilly argues that Hollingsworth did not need an accommodation because he was able to perform the essential functions of his job without an accommodation.   Second, O'Reilly argues that Hollingsworth never made a specific demand for an accommodation.

### a. Hollingsworth needed reasonable accommodations

O'Reilly argues that it did not have a duty to provide a reasonable accommodation to Hollingsworth because he satisfactorily performed the essential functions of his job without an accommodation throughout the duration of his employment.   This court, however, is unpersuaded by O'Reilly's argument because, although Hollingsworth was physically able to perform his job duties, he could only do so by incurring personal injury.   The job description for Hollingsworth's position provided that he would need to lift items weighing under sixty pounds without assistance and perform team lifts of items weighing in excess of sixty pounds.   However, Hollingsworth testified that in reality other employees frequently refused to help him, and he routinely lifted items weighing in excess of sixty pounds without assistance.   Although Hollingsworth was physically able to lift these heavy items without assistance, doing so caused him significant pain and injured his back and hip:

> Q. Uh-huh.  And you're saying that you never could get any assistance with loading and unloading batteries when you requested it.
>
> A. No, Sir.
>
> Q. Is that your testimony here today?
>
> A. Yes, sir.  Yes, Sir.
>
> Q. And the problem with the weight lifting was what?
>
> A. It was wearing this hip down, making it worse all the time.  You know, I was getting to where I could hardly stand up.

18

. . .

Q. Did you then tell them that you were having difficulties delivering [items greater than sixty pounds] because - -

A. Yes.

Q. - - of your - - your physical condition?

A. Yes.

Q. And specifically what aspect of your physical condition?

A. My leg and my back.

(Doc. 23-1, pp. 16, 20).

O'Reilly cannot avoid its obligation to provide a reasonable accommodation to Hollingsworth simply because he was able to endure the pain of performing his job. Hollingsworth's testimony that he suffered pain and injury as a result of the heavy lifting creates a genuine issue of material fact as to whether he required a reasonable accommodation.

### b. Hollingsworth's request for accommodation

An employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). The Eleventh Circuit has not determined the precise form a request for a reasonable accommodation must take but has indicated that the plaintiff's burden is not onerous and that "for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [employer] to make appropriate inquires about the possible need for an accommodation."

*United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) (internal quotation marks omitted); *see Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007).

The Eleventh Circuit in *Holly* cites the EEOC Compliance Manuarl as providing examples of accommodation requests, gives the following examples as sufficient requests for accommodation:

> Example A:  An employee tells her supervisor, "I'm having trouble getting to work and my scheduled starting time because of medical treatments I'm undergoing."

> Example B: An employee tells his supervisor, " I need six weeks off to get treatment for a back problem."

> Example C: A new employee, who uses a wheelchair, informs the employer that her wheelchair cannot fit under the desk in her office.  This is a request for reasonable accommodation.

EEOC Compliance Manual at Question 1.

In the present case, Hollingsworth engaged in similar behavior to the examples contained in the EEOC Compliance manual and sufficiently put O'Reilly on notice that he needed a reasonable accommodation.  Hollingsworth repeatedly complained to Reliford that lifting heavy items without any assistance was wearing down his hip, back, and legs, and causing him pain.  He also informed Reliford that the other employees refused to help him lift heavy items and asked Reliford to direct the other employees to assist him.  Finally, Hollingsworth made two phone calls to O'Reilly's HR department regarding his denial of reasonable accommodations.  These actions are sufficient to constitute a request for reasonable accommodation and creates an issue of material fact as to whether O'Reilly knew of Hollingsworth's disability and his desire for an accommodation.

O'Reilly also argues that Hollingsworth did not make a request for a reasonable accommodation because he failed to comply with O'Reilly's formal procedures for requesting an accommodation.  However, O'Reilly fails to point to any Eleventh Circuit precedent establishing that

a plaintiff must comply with an employer's formal procedures, and this court has found none.  Thus, this court concludes that Hollingsworth presents sufficient evidence to create an issue of material fact as to whether he requested a reasonable accommodation.

Because Hollingsworth both required and made a specific request for an accommodation, O'Reilly had a duty to provide a reasonable accommodation.  O'Reilly's failure to do so constitutes unlawful discrimination against Hollingsworth on the basis of his disability, thereby satisfying the third element of Hollingsworth's *prima facie* case.  As Hollingsworth has established his *prima facie* case, O'Reilly's motion for summary judgment as to this claim is due to be denied.

**C. Hollingsworth's Hostile Work Environment Claim Under the ADA and the ADEA**

The Eleventh Circuit has never decided in a published opinion whether a hostile work environment claim is cognizable under the ADA or the ADEA.  *See Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 896 n.9 (11th Cir. 2013) (ADA); *E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 n.7 (11th Cir. 1997) (ADEA).  Nevertheless, assuming *arguendo* that a hostile work environment claim is cognizable under the ADA or the ADEA, Hollingsworth fails to show that the elements of such a claim have been met.

To establish a hostile work environment claim, Hollingsworth must show that:

(1) he belongs to a protected group: (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in a protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive work environment; and (5) [O'Reilly] is responsible for that environment under a theory of either vicarious or direct liability.

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quotation marks omitted).  In the majority of cases, as is true in this case, it is the fourth element—that the conduct complained of was sufficiently severe or pervasive to alter the conditions of employment and create an abusive

21

work environment—that presents the greatest hurdle to a plaintiff's claim.  *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

To show that the alleged harassment was so severe or pervasive as to alter the conditions of employment, Hollingsworth bears the burden of demonstrating both that "he perceived, and that a reasonable person would perceive, the working environment to be hostile or abusive."  *Jones*, 683 F.3d at 1299.  At summary judgment, the court must accept that the plaintiff subjectively believed that the harassment was hostile or abusive.  *Jones*, 683 F.3d at 1299.  Thus, the question is whether a reasonable person would perceive the environment to be hostile or abusive.

In determining whether a reasonable person would perceive the work environment to be hostile and abusive, courts must look at the totality of circumstances; they consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).  Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult.  *Id.* at 1276–77.  Simple teasing, offhanded comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

Hollingsworth alleges O'Reilly subjected him to a hostile work environment based on the following incidents: (1) Reliford imitated Hollingsworth's limp on five to ten occasions; (2) once every couple of months Reliford would call Hollingsworth an "old man" and tell him to "go home and draw a check, quit working"; (3)  Reliford told Hollingsworth on multiple occasions that if he

could not lift the heavy items, then Hollingsworth would be replaced by someone who could; (4) some of the other employees would call Hollingsworth "gimpy" or "crip"; and (5) Reliford did not provide assistance to Hollingsworth in lifting heavy items when Hollingsworth complained that the lifting was hurting his back.  These instances are neither sufficiently severe nor pervasive to establish a hostile work environment claim.  *See Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 471–72 (6th Cir. 2014) (holding that no hostile work environment claim existed under the ADEA where assistant management called the plaintiff "old lady" on multiple occasions); *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 442 (5th Cir. 2012) (holding that repeated comments by coworkers calling plaintiff "old man," "old fart," "pops," and "grandpa" did not create a hostile work environment under the ADEA); *Kumar v. Shinseki*, 495 F. App'x 541, 543–44 (5th Cir. 2012) (holding that employer's threats to terminate the plaintiff and failure to provide accommodations to the plaintiff were insufficient to establish a hostile work environment under the ADA).

Although this court does not condone the derogatory statements directed toward Hollingsworth, the role of courts is not to enforce a general civility code in the workplace, and the tribulations he suffered while employed at O'Reilly's store do not rise to the level of a hostile work environment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing hostile work environment claims in the context of Title VII).  Because Hollingsworth cannot establish the fourth element of his *prima facie* case, O'Reilly's motion for summary judgment on this claim is due to be granted.

## V.    CONCLUSION

For the reasons discussed above, the court will GRANT O'Reilly's motion for summary judgment IN PART. The court will ENTER SUMMARY JUDGMENT in favor of O'Reilly as to

the ADEA disparate treatment claim in Count I and the ADEA and ADA hostile work environment claim in Count III.  The court will also ENTER SUMMARY JUDGMENT in favor of O'Reilly as to the ADA disparate treatment claim in Count II.  The court will DENY SUMMARY JUDGMENT as to the ADA failure to accommodate claim in Count II.  This one claim will proceed to trial.  A separate Order to this effect will be filed simultaneously.

DONE and ORDERED this 30th day of January, 2015.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE